## UNITED STATES v. BLAIR.

### No. 4315.

United States Court of Appeals
Tenth Circuit.

Jan. 2, 1952.

Arthur W. Murphy, Washington, D. C. (Holmes Baldridge, Washington, D. C., Max M. Bulkeley, Denver, Colo., Samuel D. Slade and Sidney J. Machtinger, Washington, D. C., on the brief), for appellant.

Robert S. Mitchell and Thomas E. McCarthy, Denver, Colo., for appellee.

Before HUXMAN, MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

The United States brought this suit against Hugh H. Blair, doing business as Blair Surgical Supply, to recover the difference between Blair's bid of $100.50 on a lot of gas masks sold at public auction by the War Assets Administration, and a bid of $1,542.00 by another party which was overlooked when the bids were tabulated and the property awarded to Blair. The complaint is in two counts: first, for a conversion of the property after the mistake was discovered and the bid canceled; and second, upon a subsequent oral agreement to pay the difference between the two bids. At the conclusion of all the evidence, the trial court sustained a motion for a directed verdict, and this appeal is from a judgment for Blair on that verdict.

The appellant's evidence, which in this posture of the case must be taken as true, established the following facts: On Friday, July 25, 1947, the War Assets Ad-

ministration conducted a sale of war surplus property at the Denver, Colorado Medical Depot. Under the regulations of the War Assets Administration, bids were accepted if made either in person at the site of the sale, or by mail if received prior to the time of the sale. Before the commencement of the sale in question, the following announcement was made to all present, including Blair: "In all cases the property will be awarded to the bidders submitting the highest bid. If through error we should make an award to someone other than the high bidder, the erroneous award will be revoked and the proper award will be made."

Among the items offered for sale was the lot of oxygen gas masks involved here, on which Blair bid $100.50. At the close of the sale, it was announced that his was the high bid, and in accordance with the rules of the sale, Blair paid the $100.50 and received a bill of lading for the goods. This was about twelve o'clock noon. At about two-thirty of the same afternoon, it was learned for the first time by those in charge of the sale, that a St. Louis firm had bid $1,542.00 on the oxygen masks by mail; that it had been duly received and stamped at ten-thirty on the day prior to the sale; and that for some unaccountable reason had not been reported to the auctioneer or those immediately in charge of the sale. Wolfinbarger, Chief of the Medical and Drug Division of the War Assets Administration, immediately notified Special Sales Officer Jolson of the mistake, and instructed him to cancel the sale to Blair. Soon thereafter, and about three-thirty of the same day, Wolfinbarger talked with Blair by telephone, explaining the situation and telling him that there was "nothing we could do but cancel the sale." Upon receipt of notice of the mistake, Jolson checked with the cashier to find that Blair had paid the amount of his bid, and had been issued the necessary documents to entitle him to possession of the property upon presentation to the Veterans Administration, who actually owned the property. Jolson thereupon went to the custodian of the property at the Veterans Administration Depot to inform him of the mistake, and to ask him

not to deliver the property to Blair. This occurred between two-thirty and three o'clock. While Jolson was in the custodian's office talking to him about the matter, Blair's office called to inquire when they could get delivery of the goods. The call was referred to Jolson, who expressed his regret that "there had been a mix-up" and asked that "they not take delivery of the goods until the matter was straightened out on Monday."

Apparently, a short time later, attorney Doyle, representing Blair, called Regional Attorney Blount, explaining that his client was the high bidder on the merchandise, and thought he was entitled to the delivery of it. Blount promised to find out about the matter and telephone Doyle later, or write him the "first thing Monday morning because the Office of War Assets Administration is not open on Saturday or Sunday." At that time, Blair's attorney was told not to attempt to take delivery of the property until he had received the letter stating the position of the War Assets Administration. At the same time, Doyle agreed to write Blount, stating his client's position in the matter, and to get the letter over to Blount that afternoon. Later that afternoon, Blair came to Blount's office with the letter. Blount explained the receipt of the higher bid; that it had been overlooked and not taken into consideration when the property had been awarded to Blair; that because of this mistake, Blair was not entitled to the property, and Blount testified that Blair promised him that he would not attempt to take possession of the property until after Doyle's receipt of his letter and they had conferred further on Monday. Blount attempted to talk to Doyle by telephone shortly after four o'clock, but was unable to reach him. On the following Monday morning, Blount mailed his letter to Doyle. On the same afternoon, Blount learned that Blair had presented his credentials that morning to the War Assets Administration and had obtained possession of the goods. He questioned Blair about it on the telephone, and arranged a conference with him in his office on the following Friday, August 1. On that date, Blair and his attorney Doyle, came to Blount's office, where

the matter was discussed in detail. Blount took the position that Blair's bid had been properly canceled; that he had no right to take the goods in violation of their agreement and that he was consequently liable for the difference between his bid and the higher one. Blair's attorney advised him that he was liable and should pay the difference. Blair agreed and promised to send a check that afternoon. When he failed to do so, this suit followed. Blair admits the telephone conversations and conferences, but gives a different version of them.

██ Generally, a sale by auction is complete when the auctioneer announces its completion. 7 C.J.S., Auctions and Auctioneers § 7, page 1250. And, title passes to the successful bidder at that time, unless the parties intend to the contrary. Harris v. Merlino, 137 N.J.L. 717, 61 A.2d 276; Lott v. Delmar, 2 N.J. 229, 66 A.2d 25; 7 C.J.S., Auctions and Auctioneers, § 8, page 1260. The owner of the property offered for sale at the auction has the right to prescribe the manner, conditions and terms of the sale. 7 C.J.S., Auctions and Auctioneers, § 7, page 1251. The buyer may rely upon such announced terms and conditions of the sale, and he is likewise bound thereby, whether present at the time of the announcement or has knowledge thereof. 5 Amer.Juris. Auctions, Sec. 15, p. 454; Kivett v. Owyhee County, 58 Idaho 372, 74 P.2d 87; Erie Coal & Coke Corp. v. United States, 266 U.S. 518, 45 S.Ct. 181, 69 L.Ed. 417; See Annot. 28 A.L.R. 991.

██ It follows that the award to Blair and the issuance of the title documents were subject to the announced condition that if his bid was not the highest one, the award would be "revoked and the proper award will be made", provided of course that they acted to revoke the award within a reasonable time. In directing a verdict for Blair, the trial court accepted this hypothesis, and observed that in this case the revocation had been made within a reasonable time. It took the view, however, that a restoration to the status quo was a prerequisite to the right of the Government to rescind, and inasmuch as it did not restore or offer to restore the amount of the purchase price to Blair, it did not effectively revoke the award, and Blair, having obtained possession of the goods through indicia of title, could not be guilty of conversion.

██ The general rule to the effect that a party seeking to rescind a contract must place the opposite party in status quo is not technical but equitable, and requires merely that the practical rights of the other party shall not be prejudiced. 12 Amer.Juris. Contracts, Sec. 451. According to the evidence, which we must credit, Blair was informed within a very few hours after the sale that it would be revoked, and with knowledge of the reasons therefore, he agreed not to attempt to take possession of the goods until a further conference between the attorney for the War Assets Administration and his attorney. But in violation of the agreement, Blair surreptitiously obtained possession of the property and shipped it out of the state to third parties, thereby rendering effective revocation of the sale impossible. Surely the Government is not required to go through a useless ceremony as a prerequisite to the exercise of a clear legal right. See 9 Amer.Juris. Cancellation of Instruments, Secs. 39 and 40.

This is not a contest between two bidders at an auction of Government property, where the Government agent is authorized to sell "for such price as he shall approve" as in Levinson v. United States, 258 U.S. 198, 42 S.Ct. 275, 276, 66 L.Ed. 563. Here, the highest bid was an unalterable condition of the sale, and title did not unconditionally pass to any other bidder.

██ We think the evidence presented an issue of fact, first, whether the Government acted promptly to revoke the award; second, whether in the circumstances the Government was required to restore as a condition to its right of revocation; and finally, whether Blair converted the goods, thereby rendering himself liable in damages for the amount of the highest legitimate bid, less the amount paid.

██ The trial court was of the view that the alleged agreement, if established to the satisfaction of the jury, would be without consideration and hence unenforce-

able. The Government's evidence, if believed, shows, we think, an oral agreement on the part of Blair, acting on advice of counsel, to pay the difference between the two bids. This agreement grew out of a dispute concerning Blair's bid on the property, the Government contending that it had a right to revoke the bid, and did so before Blair wrongfully took possession of the property and put it beyond the power of the parties to effect a revocation. This is the agreement the Government seeks to enforce, and it is supported by adequate consideration. See Williston on Contracts, Revised Ed., Vol. 1, Sections 100–102, p. 317–323.

The judgment is reversed with directions to proceed accordingly.