49 N.Y.2d 574 (1980)
Ehrlich-Bober & Co., Inc., Appellant,
v.
University of Houston, Respondent.
Court of Appeals of the State of New York.
Argued February 14, 1980.
Decided April 3, 1980.
John S. Martin, Jr., and Irwin J. Sugarman for appellant.
Daniel A. Pollack and Martin I. Kaminsky for respondent.
Chief Judge COOKE and Judges GABRIELLI, FUCHSBERG and MEYER concur with Judge WACHTLER; Judge JONES dissents and votes to affirm in a separate opinion in which Judge JASEN concurs.
*577 WACHTLER, J.
On this appeal an agency of the State of Texas claims immunity to suit in the New York courts because Texas law limits the jurisdictions in which it may be sued. The issue for our consideration is whether New York should observe that limitation as a matter of comity.
The plaintiff, Ehrlich-Bober & Co., Inc., is a dealer in municipal and government securities. It has its principal office in New York City. The defendant University of Houston is a public institution of higher education in the State of Texas. It is governed by a Board of Regents appointed by the Governor with the advice and consent of the State Senate, and is considered an agency of the State government. In this action the plaintiff securities dealer seeks damages arising out of alleged breaches of two "reverse repurchase" agreements it made with the defendant university.
A "reverse repurchase" agreement is, in essence, a loan transaction in which securities are sold under an agreement to repurchase them at the original purchase price, plus interest, on a specified date. Thus the securities themselves serve as collateral for the loan.
During the period from November, 1976 through March, 1977, the plaintiff and the defendant university engaged in 22 separate transactions involving the sale or purchase of securities with an aggregate value of approximately $44 million. Most of those transactions arose out of telephone calls made to the plaintiff's New York office, although on several occasions an employee of the defendant university, Samuel Harwell, visited the plaintiff's office in New York. On one of those occasions Harwell actually placed an order for government securities while present in the plaintiff's office.
*578 The two transactions at issue on this appeal began with a phone call by Harwell to the plaintiff asking if it would enter a reverse repurchase agreement for securities issued by the Government National Mortgage Association ("Ginnie Maes"). On April 18, 1977 the plaintiff bought from the defendant Ginnie Maes valued at approximately $4.6 million. This purchase was confirmed by an agreement dated April 26, 1977 on the university's letterhead and signed by Harwell. The plaintiff approved the agreement and returned it to the defendant.
The plaintiff and the defendant university entered into another reverse repurchase agreement on May 23, 1977 for securities valued at approximately $7.9 million; this agreement also provided for certain additional payments by the defendant to the plaintiff. For each such transaction the plaintiff delivered the purchase price to Manufacturer's Hanover in New York, and Manufacturer's Hanover delivered the securities to the plaintiff.
On three occasions the repurchase date for the securities involved in the April 18 transaction was extended by agreement between the parties, but on the ultimate due date the defendant refused to repurchase. The plaintiff incurred a loss of approximately $462,000 when it sold the Ginnie Maes as permitted by the April 26 agreement. The plaintiff also alleges that the defendant failed to make the additional payments required under the May 23 agreement.
Harwell is now incarcerated in Texas on fraud charges in connection with matters apparently unrelated to this action. The defendant university alleges that it was unaware of Harwell's activities in connection with the reverse repurchase agreements and did not consent to them. The defendant also alleges that it had no bank account in New York and that the role of Manufacturer's Hanover in the transactions was that of correspondent for a Texas bank only, and not as agent for the defendant.
Section 111.33 of the Texas Education Code provides that a suit against the University of Houston may be brought only in two specified counties in Texas. Special Term granted the defendant's motion to dismiss, concluding that (1) New York should as a matter of comity recognize the sovereign immunity of the Texas university; (2) the plaintiff had not met the requirements of CPLR 302 (subd [a]) for the exercise of long-arm jurisdiction over the defendant; and (3) the action should be dismissed as a matter of forum non conveniens pursuant to *579 CPLR 327. Special Term also denied the plaintiff's cross motion for injunctive relief against the defendant to prevent it from proceeding with a declaratory judgment action in Texas.
The Appellate Division affirmed the order of dismissal for lack of jurisdiction on sovereign immunity grounds,[1] but concluded that dismissal would not obtain on forum non conveniens grounds. Inasmuch as the doctrine has no application unless the court has obtained in personam jurisdiction of the parties, the Appellate Division necessarily found that the requirements for the exercise of long-arm jurisdiction had been met.
Preliminary to our consideration of the comity issue, we note our agreement with the conclusions reached by the Appellate Division that there was a proper basis for the exercise of long-arm jurisdiction and that the doctrine of forum non conveniens is inapplicable here. Although "standing by itself, a correspondent bank relationship, without any other indicia or evidence to explain its essence, may not form the basis for long-arm jurisdiction under CPLR 302 (subd [a], par 1)" (Amigo Foods Corp. v Marine Midland Bank-New York, 39 N.Y.2d 391, 396), the facts alleged here, which we accept as true for this purpose, show substantially more (cf. Longines-Wittnauer Co. v Barnes & Reinecke, 15 N.Y.2d 443). Nor may it be said in this case that the Appellate Division in its conclusion that forum non conveniens would not obtain in this case abused its discretion as a matter of law (Epstein v Sirivejkul, 48 N.Y.2d 738).
We begin our analysis of the principal jurisdictional question by noting that it was long thought that a State could not be sued by the citizens of a sister State except in its own courts. The United States Supreme Court, however, recently held that no such stricture inheres in the Federal Constitution (Nevada v Hall, 440 US 410). New York is therefore under no compulsion to observe Texas' limitation on venue of suit against its agencies as a matter of Federal law.[2] We turn now *580 to the question of whether, as a matter of comity alone, our courts should relinquish the jurisdiction already obtained over the parties.
The doctrine of comity "is not a rule of law, but one of practice, convenience and expediency" (Mast, Foos & Co. v Stover Mfg. Co., 177 US 485, 488). It does not of its own force compel a particular course of action. Rather, it is an expression of one State's entirely voluntary decision to defer to the policy of another (Zeevi & Sons v Grindlays Bank [Uganda], 37 N.Y.2d 220, cert den 423 US 866). Such a decision may be perceived as promoting uniformity of decision, as encouraging harmony among participants in a system of co-operative federalism, or as merely an expression of hope for reciprocal advantage in some future case in which the interests of the forum are more critical.
Whatever the New York rule may once have been (see, e.g., Loucks v Standard Oil Co., 224 N.Y. 99; and Mertz v Mertz, 271 N.Y. 466), it is abundantly clear that the rule has undergone a substantial evolution over six decades. It is properly said that the law must be stable yet it cannot stand still. (Pound, Interpretations of Legal History, p 1.) Today in New York the determination of whether effect is to be given foreign legislation is made by comparing it to our own public policy; and our policy prevails in case of conflict (Zeevi, supra, at p 227).
In search of the public policy of the State, courts of course are not free to indulge in mere individual notions of expediency and fairness but must look to the law as expressed in statute and judicial decision and to the prevailing attitudes of the community (see Loucks v Standard Oil Co., supra, at p 111; and Intercontinental Hotels Corp. [Puerto Rico] v Golden, 15 N.Y.2d 9, 14).
Nor, of course, may it be said that in case of conflict New York's policy will invariably prevail, no matter how insubstantial it may be, in the face of a strong assertion of interest by the other jurisdiction. Without deciding the point, we might, for example, choose to defer to the assertion of interest by another jurisdiction where the interest in question goes to *581 the very heart of the governmental function. This is not such a case.
Examination of the Texas statute, as interpreted by the courts of that State, indicates that it is as the dissent notes, "a limited legislative consent to actions against a branch of the State in the county or counties specified and only in those counties" (at p 583), i.e., it is a restrictive venue provision put in place to serve the administrative convenience of the State. It is not, by sharp contrast with the statute which was sought to be applied in Nevada v Hall (supra), an attempt to limit the liability of the State so as to safeguard the public fisc, a limitation which, conceivably might be found essential to the governmental function.
Arrayed against that policy which essentially serves administrative convenience, is New York's recognized interest in maintaining and fostering its undisputed status as the preeminent commercial and financial nerve center of the Nation and the world (International Planning v Daystrom, Inc., 24 N.Y.2d 372; see, also, Bache & Co. v International Controls Corp., 339 F Supp 341). That interest naturally embraces a very strong policy of assuring ready access to a forum for redress of injuries arising out of transactions spawned here. Indeed, access to a convenient forum which dispassionately administers a known, stable, and commercially sophisticated body of law may be considered as much an attraction to conducting business in New York as its unique financial and communications resources.
New York's interest in providing a convenient forum is least subject to challenge when a transaction is centered here (see Rubin v Irving Trust Co., 305 N.Y. 288, 305; and Auten v Auten, 308 N.Y. 155, 160), and particularly when it is wholly commercial in character (see Et Ve Balik Kurumu v B.N.S. Int. Sales Corp., 25 Misc 2d 299, affd 17 AD2d 927; Tiernan v Missouri New World's Fair Comm., 48 Misc 2d 376; cf. Dunhill of London v Cuba, 425 US 682). In those circumstances, a State entering this jurisdiction specifically to take advantage of its unique commercial resources may be considered to have given up any claim of jurisdictional immunity by virtue of governmental capacity. Conversely, this State's interest in providing a forum may be less where the issue is one which goes to the heart of a governmental function (cf. Nevada v Hall, 440 US 410, 424, supra).
In the instant case the transactions in question, judged by *582 any indicator, must be considered to have been centered here. They were initiated by an employee of the defendant university in a phone call to the plaintiff's New York offices. They were accepted in New York by the plaintiff. The money was paid in New York. The securities were delivered in New York. And finally, the repurchases were to have been accomplished in New York. It must also be concluded that these were ordinary commercial transactions having no more than an indirect relation to the fulfillment of the defendant university's governmental responsibilities.
The dissent mistakenly concludes that we confuse "constitutional authority to entertain actions with forum restrictions incident to limited waiver of sovereign immunity" (at p 585). In fact, there is absolutely no question of constitutional authority, as we note above. More serious is the dissent's notion that we confuse the requirements for obtaining long-arm jurisdiction, upon which our court is unanimous, with considerations of comity. Although the two are analytically distinct, there is no reason in law or logic why they may not overlap, or even coincide. In this instance some, but not all, of the factors which permit our courts to take jurisdiction at the same time compel its exercise.
We conclude, therefore, that where an action concerns a wholly commercial transaction centered in New York, and it is one of which the New York courts would otherwise properly have jurisdiction, they are not precluded from the exercise of that jurisdiction by an assertion of governmental immunity as a matter of comity. Any other rule would impose an intolerable burden on the major financial institutions which make their homes in New York and which provide services to State and local governments nationwide as well as to many foreign countries. As every State may establish for itself and its agencies and municipalities the conditions under which they may be sued, recognition of a rule of jurisdictional immunity as a matter of comity in this case would require New York financial institutions in the future to review the laws of every jurisdiction before consenting to do business with any agency, institution, or facility of that jurisdiction.
It is more logical, surely, to assume when a governmental entity seeks financing in the New York market that it will be amenable to suit here than to presume that the financial institution to which it comes must seek a remedy in Austin, Texas. On these facts, for our courts to relinquish jurisdiction *583 as a matter of comity would be a perverse application of the rule.
The order of the Appellate Division should be reversed and defendant's motion to dismiss the complaint denied.
JONES, J. (dissenting).
Because I am persuaded that the Appellate Division correctly disposed of this case, and because I think the analysis of the majority in our court is based on fundamental jurisprudential error and sows the seeds of potential mischief, I am obliged to dissent.
The critical issue is whether the courts in our State should recognize and give effect to the law of the State of Texas which specifically limits any possible suit against the University of Houston to an action in the Texas courts in Harris County where the university is located or in Travis County where the State government's offices are located (Texas Education Code, § 111.33).[1] The appellate courts of the State of Texas have held that a statute like section 111.33 is not a procedural venue statute but constitutes a limited legislative consent to actions against a branch of the State in the county or counties specified and only in those counties. (State v Isbell, 127 Tex 399; Hardt v Texas Dept. of Corrections, 530 SW2d 897, 898 [Tex]; Martin v State, 75 SW2d 950, 952 [Tex]; cf. Fylipoy v Gulf Stevedore Corp., 257 F Supp 166, 169, in which the Federal court in Texas held that it had no jurisdiction in an action against a political subdivision of that State.) It is for the State of Texas to classify its own statute.
Whether the courts of New York should give determinative effect to the Texas statute in this instance depends on the proper application of principles of comity; no one asserts that we are not free, should we choose to do so, to ignore the strictures of Texas law. In the application of the doctrine of interstate comity, after ascertaining the applicable law declared by our sister State, we are called upon to examine our own public policy, for "[t]he principle which determines whether we shall give effect to foreign legislation is that of public policy and, where there is a conflict between our public policy and application of comity, our own sense of justice and equity as embodied in our public policy must prevail" (Zeevi & Sons v Grindlays Bank [Uganda], 37 N.Y.2d 220, 228, cert den 423 US 886). *584 Even the existence in our jurisdiction of a statute different from that of the other jurisdiction however "does not require or authorize our courts to ignore foreign law affecting substantive rights where such law merely differs from our own. To render the foreign law unenforceable here as contrary to our public policy under such circumstances, it must additionally violate `some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal.' (Loucks v. Standard Oil Co., supra [224 N.Y. 99], p. 111; Mertz v. Mertz, supra [271 N.Y. 466].) The acceptance of that doctrine is general. (Howard v. Howard, 200 N. C. 574, 579; Buckeye v. Buckeye, 203 Wis. 248; 38 Cyc. 546-549.)" (Coster v Coster, 289 N.Y. 438, 442-443.)
If however the foreign law does not entail any such violation, and, a fortiori, if it parallels an articulated statutory policy of our own State, even though different in detail, full effect should be given to the law of our sister State (Shannon v Irving Trust Co., 275 N.Y. 95; Cross v United States Trust Co. of N. Y., 131 N.Y. 330, 341). In this instance there is a readily identifiable analogue in New York State  a closely similar forum limitation. We, as does Texas, recognize the principle of sovereign immunity and hold that it extends to units of the State University of New York as a component of State government. (Westgate North v State Univ. of N. Y., 77 Misc 2d 611, affd 47 AD2d 1004; State Univ. of N. Y. v Syracuse Univ., 206 Misc 1003, 1004, affd 285 App Div 59, 61-62; cf. George R. Whitten, Jr., Inc. v State Univ. Constr. Fund, 493 F.2d 177, 181-182; Simkin & Sons v State Univ. Constr. Fund, 352 F Supp 177, 179, affd 486 F.2d 1393; People v Branham, 53 Misc 2d 346-348.) In our case the detail of our forum restriction incorporated in the waiver of sovereign immunity with respect to the State University is slightly different  i.e., actions against the units of our State University may be maintained only in the Court of Claims  but the concept of a categorical limitation of the court in which claims against the university may be instituted is precisely the same. There is thus applicable the language in King v Sarria (69 N.Y. 24), in which the court, speaking of a foreign statute to which it was about to accord recognition under the principle of comity, said: "It much resembles our own statute * * * and, with some difference in detail, it aims at the same beneficial result, which ours has in view; nor may we say, with our statute before us, *585 that the law is opposed to good morals or abstract justice" (p 31). Inasmuch as our New York conceptually identical policy analogue parallels that of the State of Texas, we should recognize and give effect to the legislatively declared policy of that State. This is precisely what the Appellate Division did.
To hold that the disposition of the claim advanced in this case against the University of Texas is governed by our jurisdictional policy reflected in our long-arm statutes, is inappropriately to jump from one level of policy to another and to mingle and confuse policy categories. Texas, too, has a long-arm jurisdictional statute (Vernon's Ann Civ Stat, art 2031b). Its policy with respect to the authority of its courts to exercise in personam jurisdiction over corporations engaged in commercial activities within the State of Texas is comparable to ours. There is no question on this record, and having regard for the law of Texas with respect to long-arm jurisdiction, that our courts have jurisdiction over the University of Houston within that context, as the Appellate Division and all the members of our court agree.[2] But the critical question is not whether our courts have long-arm jurisdiction; it is whether, under principles of comity, our courts should exercise that jurisdiction in light of section 111.33 of the Texas Education Code. The strong policy considerations undergirding the jurisdictional stance on which the majority relies should not be confused with or permitted to obscure the strong policy considerations which dictate that, under principles of sovereign immunity, units of State government should not be exposed to claims in all courts which might otherwise have authority constitutionally to entertain suits against such units.
I can only conclude that in confusing constitutional authority to entertain actions with forum restrictions incident to limited waiver of sovereign immunity the majority in our court commits serious jurisprudential error. I am also disturbed over what appear to me to be the adverse practical implications of the position adopted by the majority. In view of the decision in this case, I am obliged to suggest that should one of the units of our State government, whether of our State University or otherwise, engage in activities in the State of *586 Texas (or in any of our sister States for that matter) sufficient to permit the constitutional assertion of in personam jurisdiction, an action could be maintained against such governmental unit in that State, despite our demonstrated legislative intent that any such action shall lie only in the New York Court of Claims. Objections to the exercise of such jurisdiction based on considerations of sovereign immunity could then be properly rejected on the ground that the highest court of our State has rejected precisely such a contention in the present case. I view such a prospect as more than mischievous.
For the reasons stated, I would affirm the order of the Appellate Division.
Order reversed, with costs, and defendant's motion to dismiss the complaint denied.
NOTES
[1] The appellant's notice of appeal to this court was from every part of the order of the Appellate Division, including the denial of the cross motion for injunctive relief. However, as its brief and argument in this court asked only reversal of the dismissal of the complaint we do not consider the denial of the cross motion.
[2] The action in Hall arose out of a collision in California involving an employee of the State of Nevada, driving a State-owned vehicle on official business. Nevada required suits against the State to be brought in Nevada, and limited a tort recovery against the State to $25,000. The California Supreme Court held that Nevada was nonetheless amenable to suit in California. Its pithy conclusion was that "state sovereignty ends at the state boundary" (Hall v University of Nev., 8 Cal 3d 522, 525). The United States Supreme Court affirmed, although it cautioned that a suit which posed a threat to a State's "capacity to fulfill its own sovereign responsibilities * * * might require a different * * * result" (440 US 410, 424, n 24, supra). The defendant here does not attempt to distinguish this case so as to bring it outside the rule of Hall (supra).
[1] Section 111.33 provides: "The board [of regents of the university] has the power to sue and be sued in the name of the University of Houston. Venue shall be in either Harris County or Travis County. The university shall be impleaded by service of citation on the president or any of its vice presidents."
[2] In this "jurisdictional" sense, all the courts of Texas may be said to have "jurisdiction" over the University of Houston and all the courts of the State of New York may be said to have "jurisdiction" over units of the State University of New York. Both States, however, have imposed restrictions on the exercise of such "jurisdiction".