**FINNISH FUR SALES CO., LTD. and Okobank Osuuspankkien Keskuspankki Oy, Plaintiffs,**

v.

**JULIETTE SHULOF FURS, INC., George Shulof and Juliette Shulof, Defendants.**

**No. 89 Civ. 2890 (PKL).**

United States District Court, S.D. New York.

July 12, 1991.

Kensington & Ressler P.C., New York City (Stuart M. Bernstein, Wendy Kaufman Goidel, of counsel), for plaintiffs.

Morrison Cohen Singer & Weinstein, New York City (Arthur J. Ciampi, of counsel), for defendants.

## OPINION AND ORDER

LEISURE, District Judge.

This is an action to collect sums allegedly owed in connection with furs purchased at two auctions in Vantaa, Finland. Plaintiff Finnish Fur Sales Co., Ltd. ("FFS"), asserts its claim of failure to pay for and clear 2,469 fox pelts against defendants Juliette Shulof Furs, Inc. ("JSF"), and George Shulof. Plaintiff Okobank Osuus-pankkien Keskuspankki Oy ("Okobank") asserts its claim of failure to honor a bill of exchange against defendants JSF and Juliette Shulof.

Defendants George and Juliette Shulof now move the Court for summary judgment dismissing the individual claims against each of them. Plaintiffs oppose defendants' motion and cross-move for summary judgment against all defendants.

## BACKGROUND

FFS is a limited company organized under Finnish law, which sells fur pelts raised by Finnish breeders at public auctions held several times each year. The auctions are conducted under certain Conditions of Sale ("Conditions"), which are listed in the auction catalogue, a copy of which is given to each prospective bidder in advance of the auction. A one-page English translation of the Conditions appears on the inside front cover of the catalogue.

JSF is a New York corporation that has conducted a fur dealing business for approximately 15 years. George Shulof, an officer of JSF, has been in the fur business since 1935. Mr. Shulof attended the FFS auctions held in Vantaa, Finland, in January and May 1987. He purchased over $500,000 worth of skins at the January auction, and some $700,000 worth of skins at the May auction. It is undisputed that at each auction he was the actual bidder. JSF had not sent a bidder to the FFS auctions during the twenty-five-year period from 1959 to 1984, but Mr. Shulof had personally attended the FFS auction in December 1986.

The parties apparently do not dispute the fact that JSF paid for and cleared the majority of the skins purchased at the two 1987 auctions, with the exception of 2,469 fox pelts worth $290,048.17. The parties also do not dispute that JSF made certain payments against the uncleared skins, leaving an unpaid balance of $202,416.85, plus interest.

Between December 1987 and December 1988, JSF gave FFS resale instructions regarding a number of the uncleared skins. FFS asserts that it was unable to sell the skins at the minimum resale prices set by JSF. Thereafter, FFS decided to liquidate JSF's account, to which JSF agreed in March 1989. FFS sold the remaining uncleared skins at its May and September 1989 auctions. FFS alleges damages of $153,502.39.

FFS claims that, in addition to the liability of JSF, Mr. Shulof is personally liable for this debt, based on Finnish law, the custom and practice of the fur trade, and the provisions of section 4 of the Conditions. Section 4 provides:

> Any person biding at the auction shall stand surety as for his own debt until full payment is made for purchased merchandise. If he has made the bid on behalf of another person, he is jointly and severally liable with the person for the purchase.

Conditions § 4 ¶ 2. George Shulof denies any personal liability on the grounds, *inter alia*, that the provision is unenforceable under both New York and Finnish law.

Okobank's claim arises from a line of credit arranged by FFS in November 1988 to allow JSF to clear some of the remaining skins. JSF made a cash down payment and accepted a bill of exchange (the "Bill of Exchange") for $30,328.39, due February 7, 1989. JSF also executed an agreement entitled "Confirmation in Case of Delayed Payment" ("Confirmation"), dated December 16, 1988, which called for interest at an annual rate of 16% subsequent to the due date.

According to plaintiffs, in January 1989, Okobank became holder in due course of the Bill of Exchange, which was presented for collection on or about February 7, 1989, at Bank Leumi in New York, but was dishonored. As of July 31, 1990, Okobank claimed principal and interest due amounting to $37,480.90.

The Bill of Exchange was signed "Juliette A. Shulof" above the printed name "Juliette Shulof Furs Inc." Okobank contends, and Mrs. Shulof denies, that this signature renders Mrs. Shulof liable in her individual capacity.

In addition to defendants' argument that, as a matter of law, George and Juliette Shulof cannot be held personally liable in this action, defendants also contend that fact issues concerning plaintiffs' alleged failure to mitigate damages when selling the remaining uncleared skins preclude the entry of summary judgment against JSF.

## DISCUSSION

### I. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "Summary judgment is appropriate if, 'after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.'" *United States v. All Right, Title & Interest in Real Property, etc.*, 901 F.2d 288, 290 (2d Cir.1990) (quoting *Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988)). Summary judgment may be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The substantive law governing the case will identify the facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.... While the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are crucial and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there does indeed exist a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2510; *see also R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 107 (2d Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials it believes "demonstrate the absence of a genuine issue of material fact." *Celotex, supra*, 477 U.S. at 323, 106 S.Ct. at 2552; *see also Trebor Sportswear Co. v. Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir.1989). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra*, 477 U.S. at 325, 106 S.Ct. at 2554.

Once a motion for summary judgment is properly made, the burden then shifts to the nonmoving party, which "'must set forth facts showing that there is a genuine issue for trial.'" *Anderson, supra*, 477 U.S. at 250, 106 S.Ct. at 2511 (quoting Fed.R.Civ.P. 56(e)). "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.'" *Delaware & H. Ry. v. Consolidated Rail Co.*, 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson, supra*, 477 U.S. at 252, 106 S.Ct. at 2512, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986)).

## II. Liability of George Shulof

### A. Choice of Law

Federal courts sitting in diversity must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In this case, application of New York choice of law analysis is required.

■ Section 15 of the Conditions provides that "[t]hese conditions are governed by Finnish law." Choice of law clauses are routinely enforced by the courts of this Circuit, "if there is a reasonable basis for the choice." *Morgan Guaranty Trust Co. v. Republic of Palau,* 693 F.Supp. 1479, 1494 (S.D.N.Y.1988) (citing Restatement (Second) of Conflict of Laws § 187 (1971)), *vacated on other grounds,* 924 F.2d 1237 (2d Cir.1991). New York courts also generally defer to choice of law clauses if the state or country whose law is thus selected has sufficient contacts with the transaction. *See, e.g., Zerman v. Ball,* 735 F.2d 15, 20 (2d Cir.1984); *Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52 (2d Cir.1984); *600 Grant St. Assocs. Ltd. Partnership v. Leon–Dielmann Inv. Partnership,* 681 F.Supp. 1062, 1064 (S.D.N.Y.1988). Under those circumstances, "New York law requires the court to honor the parties' choice insofar as matters of substance are concerned, so long as fundamental policies of New York law are not thereby violated." *Woodling v. Garrett Corp.,* 813 F.2d 543, 551 (2d Cir.1987).

Finland's contacts with the transactions at issue are substantial, rendering the choice of law clause enforceable unless a strong public policy of New York is impaired by the application of Finnish law. Plaintiff FFS is a Finnish resident, which held auctions of Finnish-bred furs in Finland. All bids were made in Finnish marks, with payment and delivery to take place in Finland. Mr. Shulof voluntarily traveled to Finland in order to partake in FFS's auctions. Thus, virtually all of the significant events related to these transactions took place in Finland. Finland also has an obvious interest in applying its law to events taking place within its borders relating to an important local industry, and in applying uniform law to numerous transactions with bidders from foreign countries.

Mr. Shulof argues that the choice of Finnish law provision should be held invalid on a number of grounds, including New York's contacts with this litigation and its interest in applying its own law. According to Mr. Shulof, New York has the following interests in this action: it is the place of business and of incorporation of JSF; FFS has a representative with a New York office who communicated with Mr. Shulof about the fur auctions; and that New York is, allegedly, "the economic and design center for the world's fur industry." Defendants' Memorandum of Law ("Def. Mem.") at 11. Mr. Shulof also argues that, under New York law, Section 4 of the Conditions would be invalid as contravening New York's policy against imposing personal liability on corporate officers, as well as under the Statute of Frauds.

■ New York courts will decline to apply foreign law that would otherwise govern if that law conflicts with a strong public policy of the forum. *See Ehrlich–Bober & Co. v. University of Houston,* 49 N.Y.2d 574, 580, 427 N.Y.S.2d 604, 608, 404 N.E.2d 726, 730 (1980); *J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda), Ltd.,* 37 N.Y.2d 220, 227, 371 N.Y.S.2d 892, 899, 333 N.E.2d 168, 175 *cert. denied,* 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975). However, "[i]n search of the public policy of the State, courts of course are not free to indulge in mere individual notions of expediency and fairness but must look to the law as expressed in statute and judicial decision.... Nor ... may it be said that in case of conflict New York's policy will invariably prevail ... in the face of a strong assertion of interest by the other jurisdiction." *Ehrlich–Bober,* 49 N.Y.2d at 580, 427 N.Y.S.2d at 608, 404 N.E.2d at 730. Thus, for New York law to displace foreign law once the latter has been demonstrated

to apply, not only must a clear conflict with New York law be shown, but New York's interest as reflected in the policy underlying its law must outweigh the interest of the other forum.

### B. Result under Finnish Law

■ Under Federal Rule of Civil Procedure 44.1, a court, "in determining foreign law, may consider any relevant material or source, including testimony." Fed.R.Civ. Proc. 44.1; *see also Ackermann v. Levine,* 788 F.2d 830, 838 n. 7 (2d Cir.1986). Both parties have submitted affidavits of Finnish attorneys on the issue of Mr. Shulof's liability under Finnish law.

FFS's expert, Vesa Majamaa ("Majamaa"), a Doctor of Law and Professor of the Faculty of Law at the University of Helsinki, gives as his opinion that the provision of Section 4 of the Conditions imposing personal liability upon the bidder, regardless of whether he bids on behalf of another, is valid both as a term of the particular auctions at issue and as a general principle of Finnish and Scandinavian auction law. *See* Declaration of Vesa Majamaa, dated June 19, 1990 (English Translation), Exhibit B to Plaintiffs' Notice of Motion for Summary Judgment.

According to Majamaa, it is "commonly accepted in Scandinavia[ ] that a bidder, by making a bid, accepts those conditions which have been announced at the auction." *Id.* ¶ 19. Further, he states:

According to the Finnish judicial system, no one may use ignorance of the law as a defense.... This same principle is also ... applicable when the matter in question concerns ... terms of trade.... If the buyer is not familiar with the terms observed in an auction, he is obliged to familiarize himself with them. In this respect, failure to inquire will result in a loss for the buyer.... If a businessman who has been and is still active in the field falls back on his ignorance in a case in which he has been offered an actual opportunity to find out about the terms of the auction, his conduct could be considered to be contrary to equitable busi-

ness practices [and] the "Principle of Good Faith"....

*Id.* ¶¶ 22, 23, 25.

Majamaa also notes that under Danish law, which he maintains would be applied by a Finnish court in the absence of Finnish decisional or legislative law on point, "it is taken for granted that someone who has bid on merchandise on someone else's account is responsible for the transaction, as he would be for his own obligation, together with his superior.... Hence the auction buyer's responsibility is not secondary, as is, for example, the responsibility of a guarantor." *Id.* ¶ 27.

Majamaa asserts that the provisions of the Finnish Contract Act allowing a court to disregard an overly harsh condition of a contract "can be applied to mutual agreements between traders only when one party is fully dependent on the other," *id.* ¶ 31, such as a private merchant that is forced to deal with a central business monopoly. Thus, he submits, these provisions are inapplicable to an arm's-length transaction between a bidder and an auctioneer. Majamaa also opines that the terms of Section 4 are neither unexpected nor harsh because "the liability has been clearly presented in the terms of the auction," *id.* ¶ 37, and because the same rule of liability would apply under Finnish law in the absence of any provision.

Mr. Shulof submits the opinion of Christian Wik ("Wik"), an attorney admitted to practice in Finland and associated with a Helsinki law firm. Wik refers to little law specifically concerning auctions, but contends that, under general principles of Finnish contract law and equity, Section 4 might be invalid as an adhesion contract or as an unreasonable provision. However, Wik's opinion is less than conclusive as to whether a Finnish court would release Mr. Shulof from any liability, finding no more than a "possible outcome that adjustment of [the terms of the Conditions by the court] would avoid a finding of individual liability on the part of George Shulof." Affidavit of Christian Wik, sworn to on May 22, 1990, ¶ 15.

After reviewing the legal arguments presented by the parties and the facts of the case, and in light of the fact that even Mr. Shulof's expert can offer no firm opinion that Section 4 is unenforceable under Finnish law, the Court concludes that a Finnish court would enforce the provisions of Section 4 and impose personal responsibility upon George Shulof for his auction bids on behalf of JSF.

### C. Result under New York Law

■ As a general rule, New York maintains a strong presumption against imposing personal liability upon a corporate officer "absent clear evidence of an intent to create individual liability." *Lerner v. Amalgamated Clothing & Textile Workers Union*, 938 F.2d 2, 5 (2d Cir.1991). New York follows this rule even when the officer is a signatory to a contract purporting to bind him personally. The New York Court of Appeals has pointed out the "great danger in allowing a single sentence in a long contract to bind individually a person who signs only as a corporate officer." *Salzman Sign Co. v. Beck*, 10 N.Y.2d 63, 67, 217 N.Y.S.2d 55, 57, 176 N.E.2d 74 (1961); *see also Savoy Record Co. v. Cardinal Export Corp.*, 15 N.Y.2d 1, 254 N.Y.S.2d 521, 203 N.E.2d 206 (1964).

Notwithstanding their reluctance to impose personal liability, however, New York courts will do so under appropriate circumstances. *See, e.g., Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988); *Paribas Properties, Inc. v. Benson*, 146 A.D.2d 522, 536 N.Y.S.2d 1007 (1st Dep't 1989).

It is also well-established under New York law, as under Finnish law, that "[t]he owner of property offered for sale at auction has the right to prescribe the manner, conditions and terms of sale.... The conditions of a public sale, announced by the auctioneer at the time and place of the sale, are binding on the purchaser, whether or not he knew or heard them." *In re Premier Container Corp.*, 95 Misc.2d 859, 408 N.Y.S.2d 725, 730 (Sup.Ct.1978) (citations omitted); *see also United States v. Blair*, 193 F.2d 557, 560 (10th Cir.1952).

In the case at bar, George Shulof contends that the provisions of Section 4 are unconscionable and would not be enforced by a New York court. He argues that Section 4 is printed in fine print, that the Conditions were unavailable to him until he arrived in Finland the week of the auction, that they differ from the conditions of other fur auctions, and that no one specifically pointed out to him the personal liability provision of Section 4.

Nevertheless, a perusal of the Conditions reveals that their entire text is only a single page long, and that all of the Conditions, including Section 4, are printed in the same size print, which, although small, is legible. The catalogue was made available to Mr. Shulof at the beginning of the four-day period prior to the auction during which potential bidders were allowed to inspect the furs. Although Mr. Shulof contends that the urgent need to inspect large numbers of furs prevented him from reading the one-page list of Conditions, he admits that he knew where they were located in the catalogue and that he did read some of the Conditions before bidding. Further, Mr. Shulof does not dispute the fact that he was given a copy of the same Conditions at the time of the 1986 auction he attended.

Under these circumstances, it seems unlikely that a New York court would refuse to enforce Section 4 in an arm's-length commercial transaction involving a sophisticated defendant accustomed to bidding at fur auctions. Moreover, even if a New York court would not enforce such a provision in a transaction to which New York law clearly applied, this Court does not find New York's interest in protecting one of its residents against personal liability as a corporate officer to constitute so fundamental a policy that New York courts would refuse to enforce a contrary rule of foreign law. Indeed, the New York Court of Appeals has held that "foreign-based rights should be enforced unless the judicial enforcement of such a contract would be the approval of a transaction which is inherently vicious, wicked or immoral, and shocking to the prevailing moral sense." *Intercontinental Hotels Corp. v. Golden*, 15

N.Y.2d 9, 13, 254 N.Y.S.2d 527, 529, 203 N.E.2d 210 (1964) (enforcing foreign gambling debt); *see also Loucks v. Standard Oil Co.,* 224 N.Y. 99, 110, 120 N.E. 198, 201 (1918) (Cardozo, J.) (foreign cause of action should be enforced unless it "offend[s] our sense of justice or menace[s] the public welfare"); *Ackermann, supra,* 788 F.2d at 841; *Schultz v. Boy Scouts of Am., Inc.,* 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985).

■ Defendant also argues that the provision is invalid under New York's Statute of Frauds as a special promise to answer for the debt or default of another under New York General Obligations Law § 5–701(a)(2) (McKinney 1989). However, the status of Section 4 under New York law is not established on the present record. Under similar circumstances, New York courts have held that an agreement of a corporate officer to be jointly and severally liable with the corporation is not a guaranty or promise to answer for another's debt, but a primary obligation. *See Paribas Properties, supra,* 536 N.Y.S.2d at 1009.

Moreover, regardless of the applicability of New York's Statute of Frauds to Section 4, formal requirements such as the Statute of Frauds do not constitute a "fundamental policy" for the purpose of choice of law analysis, except in the case of contracts relating to wills. *See* Restatement (Second) of Conflicts of Laws § 187, comment g (1971); *Nakhleh v. Chemical Construction Corp.,* 359 F.Supp. 357, 360 (S.D.N.Y.1973). Thus, a violation of the Statute of Frauds in this instance would not cause a New York court to disregard Finnish law.

Given the lack of a clear conflict with either New York law or policy, this Court concludes that a New York court would apply Finnish law to the issue before the Court. The Court also notes that a similar result has often been reached under New York conflicts rules even in the absence of a contractual choice of law clause. *See Transatlantic Cement, Inc. v. Lambert Freres et Cie.,* 462 F.Supp. 363, 365 (S.D.N.Y.1978) (under New York conflicts rules, French law governed contract dispute where defendants were French citizens, preliminary negotiations occurred in France and the alleged agreement occurred in France); *Teledyne Indus. v. Eon Corp.,* 373 F.Supp. 191, 200 (S.D.N.Y.1974) (under New York conflicts rules, California law governed where contract between California plaintiff and New York defendant with California division was negotiated and signed in California).

Thus, Mr. Shulof must be held jointly and severally liable with JSF for any damages owed to FFS for the furs purchased at its 1987 auctions, and his motion for summary judgment is denied.

## III. Liability of Juliette Shulof

■ The parties agree that New York law governs the issue of the liability of Juliette Shulof on the Bill of Exchange, which was executed and payable in New York. The parties do not dispute that the Bill of Exchange is a negotiable instrument, and therefore subject to the provisions of Article 3 of the Uniform Commercial Code, as adopted by the state of New York.

The relevant section of the Code is § 3–403, which governs signatures by authorized representatives. Under subsection (2):

An authorized representative who signs his own name to an instrument

(a) is personally obligated if the instrument neither names the person represented nor shows that the representative signed in a representative capacity;

(b) except as otherwise established between the immediate parties, is personally obligated if the instrument names the person represented but does not show that the representative signed in a representative capacity, or if the instrument does not name the person represented but does show that the representative signed in a representative capacity.

N.Y.U.C.C. Law § 3–403(2) (McKinney 1991).

Official Comment 3 to this section offers examples of signatures and the legal implication of each type of signature. An authorized representative will not be personally bound by the following: a signature in the name of the represented party; "Peter Pringle by Arthur Adams, Agent"; or "Arthur Adams, Agent" (assuming that the principal is named in the instrument). In the case of a signature such as "Arthur Adams, Agent," or "Peter Pringle Arthur Adams," parole evidence may be offered in litigation between the immediate parties to prove representative capacity.

In the case at bar, Mrs. Shulof signed as "Juliette A. Shulof" above a typed name of "Juliette Shulof Furs Inc.," which had been typed in by the preparer of the instrument, FFS. The cases interpreting signatures of this type demonstrate the special treatment of negotiable instruments under New York law. As reflected in the discussion in an earlier section of this opinion, New York has, as a general rule, a policy against imposing personal liability on corporate officers if the circumstances are ambiguous. However, this policy gives way before the policy considerations underlying N.Y.U.C.C. § 3–403, which "aims to foster certainty and definiteness in the law of commercial paper, requirements deriving from the 'necessity for takers of negotiable instruments to tell at a glance whose obligation they hold.'" *Rotuba Extruders, Inc. v. Ceppos*, 46 N.Y.2d 223, 228, 413 N.Y.S.2d 141, 143, 385 N.E.2d 1068, 1070 (1978) (quoting White & Summers, *Uniform Commercial Code* § 13–2, at 399)).

Construing Section 3–403(2), the New York Court of Appeals held that "the basic law is that resort to extrinsic proof is impermissible when the face of the instrument itself does not serve to put its holder on notice of the limited liability of a signer." *Id.* In *Rotuba*, a promissory note had been signed by the chief executive officer of a corporation as "Kenneth Ceppos," on a signature line directly below the printed name of the corporation. The Court held that under Section 3–403(2)(b), the note named the corporation but did not indicate that Ceppos had signed in a representative capacity, and that only sufficient

evidence establishing an agreement between the immediate parties that Ceppos would not be personally liable would excuse him from such liability. In the absence of such evidence, summary judgment against Ceppos was appropriate. *Id.*, 46 N.Y.2d at 228–231, 413 N.Y.S.2d at 143–45, 385 N.E.2d 1068.

In *Bankers Trust Co. v. Javeri*, 105 A.D.2d 638, 481 N.Y.S.2d 362 (1st Dep't 1984), the Appellate Division stated unequivocally that in the case of a holder in due course, the suit is not between the "immediate parties" to the negotiable instrument, and that extrinsic evidence cannot be introduced to release the signatory from his personal obligation. *See id.*, 481 N.Y.S.2d at 363–64; *see also Tropical Ornamentals, Inc. v. Visconti*, 115 A.D.2d 537, 495 N.Y.S.2d 729 (2d Dep't 1985).

A court in this District has also held, under New York law, that as to a holder in due course "the relevant inquiry is limited to whether the face of the instrument put [the holder] on notice that [the signatory] signed in his representative capacity only.... This is true even though the check also bears the [corporation's] imprint." *Carador v. Sana Travel Serv., Ltd.*, 700 F.Supp. 787, 791 (S.D.N.Y.1988), *aff'd without opin.*, 876 F.2d 890 (2d Cir. 1989).

The Court finds the case at bar to be analogous to the holdings in *Javeri* and *Rotuba*. It is undisputed that Okobank never dealt with either of the Shulofs or JSF. Mrs. Shulof offers no evidence sufficient to raise a triable issue of fact as to either Okobank's status as a holder in due course or her allegations of fraud in the inducement on the part of FFS. Accordingly, the Court finds that Mrs. Shulof's signature on the Bill of Exchange did not give notice that she signed in a representative capacity only, and therefore she is personally liable for the amount of the bill. Her motion for summary judgment is denied, and the motion of Okobank for summary judgment against Juliette Shulof is granted.

## IV. Liability of Juliette Shulof Furs, Inc.

JSF's liability under the Bill of Exchange is not disputed, and Okobank's motion for summary judgment against JSF is therefore granted.

■ JSF's failure to pay for and clear a number of the furs that it purchased at auction is also uncontested. However, defendants contend that material issues of fact exist concerning FFS's alleged failure to mitigate damages by reselling those furs in a commercially reasonable manner.

Defendants argue that

> FFS did not act reasonably but instead "dumped" furs, including the furs bid upon by JSF, on the market resulting in a depression of the worldwide price of furs. For example, by conducting an auction in December of 1987 FFS irretrievably depressed the market for fox fur by offering goods at a time when there were no buyers.

Reply Affidavit of George Shulof, sworn to on July 10, 1990, ¶ 14.

FFS contends that its sale of the remaining furs bid upon by JSF was commercially reasonable as a matter of law. The Director of Auction Services for FFS has testified that FFS

> faithfully followed Mr. Shulof's resale instructions throughout 1988, and during that period, never sold a skin for less than his minimum price. [FFS] did not start liquidating the account until the middle of 1989, eighteen months after [FFS] supposedly "dumped" foxes on the market. Mr. Shulof does not even speculate on how the 1987 "dumping" affected the 1989 market.

Reply Declaration of Pirkko Rantanen–Kervinen, dated Sept. 20, 1990, ¶¶ 5–6.

George Shulof admits that FFS followed his resale instructions until December 1988. He also admitted at his deposition that, aside from his and JSF's affirmative defenses, the figures put forward by FFS concerning the amount owed by JSF were properly calculated. *See* Deposition of George Shulof, dated Dec. 19, 1989, at 153–60. Mr. Shulof further admitted that every aspect of FFS's resales of the JSF furs was commercially reasonable with the exception of the timing. *Id.* at 68–69.

Defendants cite no law concerning the scope of FFS's duty to mitigate, while FFS assumes for the purposes of argument that the standards of the Uniform Commercial Code apply to this sale of goods. *See* Plaintiff's Reply Memorandum of Law at 18 n. 10. Under U.C.C. § 2–706(1), a seller's remedies for breach include "the difference between the resale price and the contract price together with any incidental damages," as long as the goods concerned were resold "in good faith and in a commercially reasonable manner."

FFS also points to the provisions for resale of collateral by secured creditors of Article 9 of the U.C.C., noting that FFS retained a security interest in the furs in its possession. Section 9–507(2) of the U.C.C. states, in pertinent part:

> The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefore or if he sells at the price current in such market at the time of his sale ... he has sold in a commercially reasonable manner.

U.C.C. § 9–507(2).

Defendants submit no evidence demonstrating that FFS disposed of their furs in any manner other than at regularly scheduled auctions, at the currently prevailing price. Rather, defendants argue that because world prices for fox furs declined in late 1987, FFS should have withheld its furs, and that in continuing to hold regular auctions, FFS depressed the price of furs sufficiently to constitute a failure to mitigate damages when FFS resold the furs bid upon by JSF in 1989. This argument is unsupported by anything more than the opinion of Mr. Shulof, who is admittedly not an expert on world fur prices or the effects of "dumping." Furthermore, it would impose entirely unreasonable condi-

tions on FFS, requiring it to suspend the bulk of its operations, possibly for years, until fur prices rose, simply in order to mitigate its damages on a relatively small number of furs, regarding which JSF and not FFS breached its obligations.

Accordingly, the Court finds that the resale by FFS of the furs bid upon but not cleared by JSF was commercially reasonable as a matter of law. Because none of the defendants have contested FFS's calculations of damages except for its alleged failure to mitigate, FFS's motion for summary judgment is granted both as to liability and to damages.

## CONCLUSION

The motion of defendants George and Juliette Shulof for summary judgment is denied.

Plaintiffs' motion for summary judgment against all defendants is granted. Plaintiffs' motion for costs is denied. Plaintiffs are directed to submit to the Court a form of judgment in accordance with this opinion.

SO ORDERED.