[762 NYS2d 607]

In the Matter of Curtis, Mallet-Prevost, Colt & Mosle, LLP, Respondent, v Edgar H. Garza-Morales, Appellant.

First Department, July 31, 2003

APPEARANCES OF COUNSEL

*Joseph D. Pizzurro* of counsel (*Curtis, Mallet-Prevost, Colt & Mosle LLP,* attorneys), for respondent.

*Donald F. Schneider* of counsel (*Schneider Goldstein Bloomfield LLP,* attorneys), for appellant.

## OPINION OF THE COURT

FRIEDMAN, J.

In 1999, respondent in this CPLR article 75 proceeding, a New York attorney, entered into an agreement with his partners in petitioner, a New York-based law firm, that contained a broad provision for arbitration of disputes in New York. Two years later, when a dispute arose, respondent commenced a legal proceeding against his firm in Mexico, in which he asserted statutory claims not subject to arbitration under Mexican law. In seeking reversal of the injunctive relief the IAS court granted the firm against further prosecution of the Mexican proceeding, respondent argues that the doctrine of comity supplants the parties' arbitration agreement simply because respondent alleges that he maintains a part-time residence, and performed a portion of his work for the firm, in Mexico. We hold that these circumstances do not warrant setting aside this State's strong and longstanding policy favoring agreements to arbitrate, especially since the case arises from a relationship between a *New York law firm* and a *New York attorney* that, as discussed more fully below, was *centered in New York*. Accordingly, we affirm the injunction barring respondent from further prosecuting the Mexican proceeding.

Respondent Edgar H. Garza-Morales (Garza-Morales), a native of Mexico, has resided in New York City continuously at least since 1977, has been a member of the bar of this state since 1979, and has been a United States citizen since 1988. Garza-Morales was affiliated with the petitioner law firm, Curtis, Mallet-Prevost, Colt & Mosle, LLP (Curtis), for nearly a quarter-century, from 1977 to 2001, first as an associate, and then, from 1991 to 2001, as a nonequity partner. Although Curtis has several branches throughout the world, Garza-Morales does not dispute that, throughout his lengthy tenure with Curtis, the only one of these branches at which he was based or assigned an office was Curtis's New York office. In 1999, Garza-Morales entered into an amended and restated partnership agreement with his partners that obligated each of them to resolve "[a]ny dispute or claim arising out of or in any way relating to this Agreement or the Partnership" through arbitration in New York City.

In 2001, Garza-Morales and his partners had a falling out, as a result of which he was voted out of the firm as of December 20 of that year. Thereupon, notwithstanding the partnership agreement's broad arbitration clause, Garza-Morales commenced a legal proceeding against Curtis in a Mexican labor tribunal, in which he asserted Mexican statutory claims for back pay and reinstatement. Garza-Morales invoked the tribunal's jurisdiction based on the presence in Mexico City of a Curtis branch office and of a Mexican law firm affiliated with Curtis (Curtis-Mexico). Garza-Morales also alleged in support of the tribunal's jurisdiction (1) that Garza-Morales continued to maintain a residence in Mexico, (2) that Garza-Morales had performed a portion of his work for Curtis in Mexico, and (3) that, in spite of signing Curtis's partnership agreement, Garza-Morales had in reality been only an employee of the firm. Notably, Garza-Morales selected as the venue of the Mexican proceeding the city of Monterrey, where he grew up and allegedly continues to maintain a part-time residence, although Curtis's only office in Mexico, and Curtis-Mexico's sole office, are in Mexico City, approximately 580 miles away (*see* 2003 Rand McNally Road Atlas Deluxe: United States, Canada and Mexico, at 128). It is also noteworthy that Garza-Morales does not dispute Curtis's contention that he did not record a single hour of billable time in Mexico during his last two years with the firm.

In response to Garza-Morales's commencement of the Mexican proceeding, Curtis commenced this proceeding seeking to compel Garza-Morales to arbitrate the dispute (including Curtis's claims against him for breach of fiduciary duty and for the return of firm files) and to enjoin Garza-Morales from further prosecution of the Mexican proceeding. The IAS court ordered Garza-Morales to submit to arbitration in New York (a ruling not challenged on this appeal), and issued an injunction directing him to take no further steps to prosecute the Mexican proceeding. We now affirm the grant of injunctive relief.

The starting point of our analysis is the long-settled principle that a party seeking to enforce a valid agreement to arbitrate in New York under CPLR 7503 (a) is entitled, as a matter of course, to injunctive relief against further prosecution of proceedings in tribunals of other jurisdictions concerning matters within the scope of the arbitration agreement (*see H. M. Hamilton & Co. v American Home Assur. Co.*, 15 NY2d 595 [1964], *affg* 21 AD2d 500, 502 [1964]; *Matter of Wolff Co. [Tulkoff]*, 9 NY2d 356, 361-362 [1961]; *Matter of Pricewater-*

*houseCoopers L.L.P. v Rutlen*, 284 AD2d 200 [2001]; *see also Nico Constr. Co., Inc. v Installux Co.*, 1989 WL 146779, \*1, 1989 US Dist LEXIS 14247, \*2-3 [SD NY, Nov. 30, 1989, 89 Civ 7521] [court, applying New York law, enjoined prosecution of French proceedings]; Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C7503:1 [1], at 454 [1998]; Siegel, NY Prac § 592, at 1000 [3d ed]; 13 Weinstein-Korn-Miller, NY Civ Prac ¶ 7503.22). Similar relief is available under the Federal Arbitration Act (9 USC § 1 *et seq.*; *see Newbridge Acquisition I, L.L.C. v Grupo Corvi, S.A. de D.V.*, 2003 WL 42007, \*3, 2003 US Dist LEXIS 55, \*7-8 [SD NY, Jan. 6, 2003, 02 Civ 9839] [enjoining prosecution of Mexican proceedings]; *Smoothline Ltd. v North Am. Foreign Trading Corp.*, 2002 WL 273301, \*6, 2002 US Dist LEXIS 3123, \*19-20 [SD NY, Feb. 27, 2002, 00 Civ 2798] [enjoining prosecution of proceedings in Liechtenstein]).

If an injunction against the prosecution of a foreign proceeding commenced in violation of a valid arbitration agreement were, as the dissent asserts, "extraordinary relief" not readily granted, an arbitration agreement would be easily defeated, and compliance therewith would be rendered essentially voluntary, in any case having even a minimal connection to a foreign jurisdiction. As the Court of Appeals has explained:

> "The purpose of a stay is to enforce a contractual obligation to arbitrate by preventing other actions or proceedings inconsistent with that obligation. If our courts may only prevent inconsistent actions or proceedings in the courts or administrative agencies of this State, they will only be providing partial enforcement of the promise to arbitrate; if the court's power to stay were thus limited, the obligation of the contract could easily be frustrated by the prosecution of actions or proceedings in another jurisdiction.
>
> "\* \* \* To deny to our courts the power to grant specific performance of an arbitration clause by enjoining the prosecution of foreign proceedings would be a step backward. It would partially reestablish the long-abandoned doctrine that an agreement to arbitrate is revocable. We may not and should not take such a step unless expressly directed to do so by the Legislature." (*Matter of Wolff Co. [Tulkoff]*, *supra* at 361-362.)

Our dissenting colleague, essentially adopting Garza-Morales's position, would have us depart from the foregoing principles by holding that, notwithstanding any otherwise applicable agreement to arbitrate in New York, comity mandates the denial of injunctive relief against proceedings in a foreign country where requiring the party who commenced those proceedings to arbitrate the foreign claims would violate the "public policy" of the foreign forum. Essentially, the dissent and Garza-Morales contend, so long as there is sufficient connection between a foreign country and a dispute otherwise arbitrable in New York to provide a pretext for suing abroad, the proponent of arbitration will be forced to litigate in the foreign country if that country would not enforce the arbitration agreement under its own laws. We reject the view that any such evisceration of New York's "long and strong public policy favoring arbitration" (*Matter of Smith Barney Shearson v Sacharow*, 91 NY2d 39, 49 [1997]) is required by the doctrine of comity.

In arguing that our policy favoring arbitration is overridden in this case by the countervailing doctrine of comity, the dissent and Garza-Morales rely primarily on a 1960 Court of Appeals decision, *Arpels v Arpels* (8 NY2d 339 [1960]), and a 1985 decision of this Court, *Faberge Intl. v Di Pino* (109 AD2d 235 [1985]). *Arpels* provides no support for Garza-Morales's position, and *Faberge*, assuming that it should be followed, is readily distinguishable.

Turning first to *Arpels*, that decision's statement that resort to litigation in a foreign court generally should not be enjoined unless "there is danger of fraud or gross wrong being perpetrated on the foreign court" (8 NY2d at 341) was made in the context of litigation in which neither party invoked any arbitration agreement. Because *Arpels* did not involve any attempt to enforce an arbitration agreement, New York's policy favoring arbitration simply was not implicated in that case. Nothing in *Arpels* speaks to the issue presented by this appeal, which is whether a foreign country's hostility to arbitration of certain claims warrants the denial of full enforcement of an otherwise applicable agreement to arbitrate in New York.

Our dissenting colleague would graft the *Arpels* standard for enjoining foreign proceedings, articulated in a case in which no arbitration agreement was invoked, onto cases where such an injunction is sought to enforce an applicable arbitration agreement. We decline to take this step, as to do so would abruptly curtail the enforceability of an agreement to arbitrate in New York. Moreover, in arguing that *Arpels* cannot be

distinguished from this case on the ground that there was no arbitration issue in *Arpels*, the dissent implicitly takes the position that, for purposes of considering an application to enjoin foreign proceedings, there is no material distinction between a case involving an arbitration agreement, on the one hand, and, on the other hand, a case involving no such agreement. Given the high priority this State has long given to its policy favoring arbitration, we cannot agree with this view.

As for *Faberge*—the only precedent brought to our attention in which injunctive relief against prosecution of foreign litigation was denied notwithstanding the existence of an arbitration agreement—the holding of that case should, in view of the strong public policy favoring arbitration, be limited to its particular facts. The parties to *Faberge* were a corporation (Faberge) and one of its executives (Di Pino). Although Di Pino's employment agreement provided for arbitration in New York, it appears to have been undisputed that Di Pino, whom Faberge first employed as an international sales executive and subsequently as general manager of its Italian branch, had been based in Italy for the entirety of his 13-year tenure with the company. The opinion states that, upon being hired by Faberge, Di Pino, an Italian-born American citizen, "returned to Italy to work for [the company]" (109 AD2d at 236). Under these circumstances, we vacated the injunction Faberge had been granted against Di Pino's commencement of proceedings in Italy to obtain Italian statutory severance benefits, finding that Faberge had not established that a waiver of such statutory rights would be enforceable in Italy (*id.* at 240-241).

The result in *Faberge* is best explained by the fact that there was no dispute that the relationship between Faberge and Di Pino was centered in Italy. This key fact renders *Faberge* inapposite to the case before us, in which the relationship between Curtis and Garza-Morales was plainly centered in New York. To reiterate, it is undisputed that Garza-Morales, a member of the New York bar since 1979, was based at Curtis's New York office, and only at the New York office, through the entirety of his 24 years with the firm. It is also undisputed that Garza-Morales resided in New York City through all of those 24 years. True, Garza-Morales traveled to Mexico on business for Curtis from time to time, and, in his capacity as a member of the Mexican bar, served as a "founding partner" of Curtis-Mexico. Nonetheless, whatever the precise proportion of his work that he performed in Mexico, and whether or not he actually resides at his purported Mexican address, the undisputed and dispositive fact remains that Garza-Morales was, from the beginning

to the end, a New York-based employee or partner of Curtis.

Garza-Morales's failure to dispute that he was always based in New York, and nowhere else, is readily understood when the location of his only alleged residence in Mexico is borne in mind. Again, Garza-Morales's alleged Mexican residence is in Monterrey, which is nearly 580 miles from Mexico City, the location of Curtis's only Mexican office and of Curtis-Mexico's sole office. If further confirmation that the parties' relationship was centered in New York were required, it would be sufficient to recall that Garza-Morales billed no time at all from Mexico during his last two years with the firm.

Neither is it plausible for the dissent and Garza-Morales to take the position that the Mexican statutory claims are not within the scope of the parties' arbitration agreement. The Court of Appeals has stated the applicable rule as follows:

> "[W]hile a specifically enumerated restriction upon arbitral authority will be upheld by the courts, no such limitation upon either factual or legal dispute resolution will be inferred from a broadly worded contractual provision expressly calling for the arbitration of all disputes arising out of the parties' contract." (*Maross Constr. v Central N.Y. Regional Transp. Auth.*, 66 NY2d 341, 346 [1985] [citations omitted].)

Bearing in mind this teaching, the arbitration clause of the Curtis partnership agreement—which covers "[a]ny dispute or claim *arising out of or in any way relating to this Agreement or the Partnership*" (emphasis added)—plainly incorporates any dispute or claim arising from the professional relationship between Curtis and Garza-Morales. It makes no difference whether the parties' relationship is characterized as one of partnership or employment, which jurisdiction's law is alleged to give rise to the asserted claim, or whether the Mexican statutory claims have any merit. Nothing in the partnership agreement gives the slightest hint of an intent to exclude foreign statutory claims for back pay and reinstatement from the scope of arbitration. Indeed, it is difficult to conceive of more inclusive language the parties could have used to express their agreement to arbitrate.*

The fundamental flaw of the approach of the dissent and Garza-Morales is to treat the doctrine of comity as a rigid rule

---

* Since Garza-Morales's Mexican statutory claims fall within the scope of the parties' arbitration agreement, their merits should be left for the arbitra-

that overrides the deeply rooted public policy of this State to enforce freely made arbitration agreements. This completely misconceives the nature of comity. As the Court of Appeals has explained:

> "The doctrine of comity 'is not a rule of law, but one of practice, convenience and expediency' (*Mast, Foos & Co. v Stover Mfg. Co.*, 177 US 485, 488). It does not of its own force compel a particular course of action. Rather, it is an expression of one State's entirely voluntary decision to defer to the policy of another (*Zeevi & Sons v Grindlays Bank [Uganda]*, 37 NY2d 220, *cert den* 423 US 866). * * *
>
> "Today in New York the determination of whether effect is to be given foreign legislation is made by comparing it to our own public policy; and *our policy prevails in case of conflict* (*Zeevi, supra* at p 227)." (*Ehrlich-Bober & Co. v University of Houston*, 49 NY2d 574, 580 [1980] [emphasis added].)

In *Ehrlich-Bober*, the Court of Appeals permitted an action against a Texas state university to go forward in New York, notwithstanding that a Texas statute limited the venue of suits against the university to two specified Texas counties. The Court of Appeals concluded that comity did not require giving the Texas statute precedence over New York's compelling interest in providing a forum for redress of an injury that arose from a commercial transaction centered in New York (*id.* at 581-582). Similarly, in this case, which also involves a contractual relationship centered in New York, this State's strong public policy to honor arbitration agreements should prevail over the Mexican policy against arbitration of Garza-Morales's alleged statutory claims. To the extent the competing policies of New York and Mexico should be "weighed" against each other as part of the comity analysis (*see Faberge*, 109 AD2d at 240), New York's policy favoring arbitration should always be given primacy over a foreign country's policy disfavoring arbitration where, as here, the parties' relationship was centered in New York, the parties have expressly agreed to arbitrate all disputes in New York, and the dispute involves only private parties.

---

tors to determine. Thus, the dissent, in stating that "Curtis has failed to establish that Garza-Morales's claims under Mexican law are not viable," addresses a question that is not properly before us. To the extent the dissent relies on the discussion in *Faberge* of the scope of the arbitration clause in that case, that discussion constitutes mere dicta and appears to be inconsistent with the subsequent *Maross* decision.

In arguing that a court facing a case like this should somehow "weigh" New York's policy favoring arbitration against a foreign country's conflicting policy, Garza-Morales raises more questions than he answers. To begin, Garza-Morales does not explain how one determines which jurisdiction's policy "outweighs" that of the other. Nor does Garza-Morales offer reasons for placing the burden of proof for these purposes on the proponent of this State's own public policy, rather than on the party seeking to displace that policy with the conflicting policy of a foreign jurisdiction. Finally, and most importantly, Garza-Morales fails to explain the basis for his assertion that, in the present case, Mexico's policy precluding full enforcement of the parties' arbitration agreement outweighs New York's policy favoring full enforcement of that agreement. This crucial question also goes unanswered by the dissent. The dissent's observation that courts use flexible balancing tests from time to time does not provide any substantive justification for the displacement of New York public policy the dissent would have us effect.

We further note that the position of the dissent and Garza-Morales, if adopted as the law of this State, would give rise to a legal anomaly. The Court of Appeals has recently held New York's policy in favor of arbitration to be so strong that it overrides all but a very few other public policies of the State itself (*see Matter of New York City Tr. Auth. v Transport Workers Union of Am.*, 99 NY2d 1 [2002]). According to the dissent and Garza-Morales, this urgent policy of our own State should be readily displaced by a foreign country's conflicting policy whenever a party sues in that country on a claim not subject to arbitration there, so long as the foreign country has some connection to the parties' contractual relationship. We see no reason to reach such a curious result.

In closing, we observe that the Court of Appeals urged us in *Ehrlich-Bober* to safeguard New York's "recognized interest in maintaining and fostering its undisputed status as the preeminent commercial and financial nerve center of the Nation and the world" (49 NY2d at 581 [citations omitted]). This compelling interest is served by the policy favoring arbitration. Particularly in contracts between individuals or firms of different nationalities, parties stipulate to arbitration in New York largely for the purpose of controlling the risks of doing business by defining, in advance and by voluntary agreement, the forum and method of dispute resolution. Through decades of consistent enforcement of such arbitration agreements, the

courts of this State have helped to foster New York's position as the international capital of business and finance. If we were to accede to Garza-Morales's request that we make full enforcement of an agreement to arbitrate in New York dependent on the attitude toward arbitration of a foreign country in which the parties agreed *not* to litigate, we would throw into doubt the extent to which an arbitration agreement will be enforced whenever the transaction or the parties have some connection to a foreign country. In declining to take such a step, we reaffirm New York's long-settled law and policy favoring arbitration, thereby helping to maintain New York's central role in the economy of the nation and the world.

Accordingly, the order of the Supreme Court, New York County (Emily Goodman, J.), entered May 7, 2002, which, insofar as appealed from as limited by the briefs, granted Curtis's CPLR article 75 petition to the extent it seeks to enjoin Garza-Morales from further prosecution of a proceeding against Curtis in a Mexican labor tribunal in Monterrey, Nuevo León, Mexico, and order, same court and Justice, entered June 25, 2002, which directed Garza-Morales, inter alia, to take all steps necessary to comply with the order entered May 7, 2002, and to refrain from taking further affirmative steps of any kind in connection with the aforesaid Mexican proceeding, should be affirmed, without costs.

GONZALEZ, J. (dissenting). The issue on this appeal is whether the IAS court properly enjoined respondent Edgar H. Garza-Morales from continuing with the proceeding he commenced before a Mexican labor tribunal in view of the parties' agreement to arbitrate "any dispute" arising out of their partnership agreement. Because the majority's holding has sanctioned an injunction against foreign litigation while simultaneously dispensing with the rigorous showing required by this State's courts for such extraordinary relief, and in doing so, has undermined the integrity and authority of that foreign tribunal, I respectfully dissent.

The facts underlying the dispute are briefly stated. Garza-Morales is a Mexican-born lawyer who was admitted to practice in both Mexico and New York. He joined Curtis in 1977 as an associate, working in the New York office. In 1991, Garza-Morales became an "agreed payment partner," or contract partner, of Curtis, with the understanding that he would assist the law firm in its efforts to establish a Mexican branch. In that year, the Mexican law firm of Diez, Garza-Morales y Prida,

S.C. (S.C.) was established under Mexican law, and, after Curtis purchased 49% of the equity of S.C. in 1995, its name was changed to Curtis, Mallet-Prevost, Colt & Mosle, S.C. (Curtis S.C.).

The parties disagree on one significant point. According to Garza-Morales, after 1991 he spent "roughly half" his time in Mexico working for clients of Curtis and Curtis S.C., and the other half working in Curtis's New York office. Garza-Morales also asserts that he maintains residences in both New York and Monterrey, Mexico. Curtis counters that Garza-Morales has always been based in its New York office during his tenure with the firm, and he never spent any extended time in the Mexico office of Curtis S.C. or any other Curtis office outside of New York. Curtis further implies that Garza-Morales does not actually have a residence in Mexico, but merely has family there.

The governing partnership agreement executed by Garza-Morales in his capacity as a Curtis agreed payment partner provided for arbitration in New York City of "any dispute or claim arising out of or in any way relating to this agreement or the Partnership." Partners are defined in the agreement as including agreed payment partners.

In late 2001, a dispute arose between Garza-Morales and the law firm. According to Curtis, Garza-Morales's productivity fell off to the point where his nonbillable hours far outnumbered the billable hours; he spent firm time working on personal matters for which the firm received no payment; he ceased coming to the office in November 2001; and he attempted to transfer firm files and office furniture to his New York City home, but was prevented from doing so. As a result of this conduct, Curtis's partners voted him out of the partnership in December 2001.

In contrast, Garza-Morales contends that the law firm dismissed him as a result of his legal argument in an unrelated malpractice suit that he should not be held liable because he was only a "contract partner" of Curtis. Garza-Morales further asserted that his low billable hours were due to a health problem, about which the law firm was aware.

In December 2001, Garza-Morales filed the complaint in the Mexican proceeding, alleging claims against Curtis, its partners, Curtis S.C. and two of its partners, seeking reinstatement and payment of earned compensation. Although acknowledging that he was a contract partner of Curtis, Garza-Morales's complaint alleges that he was essentially an employee of Curtis.

On April 12, 2002, immediately after receiving the complaint in the Mexican proceeding, Curtis filed a demand for arbitration with the American Arbitration Association alleging that Garza-Morales had breached his fiduciary duties and sought, inter alia, damages and the return of firm files. Curtis also commenced the instant special proceeding against Garza-Morales to compel him to arbitrate the dispute pursuant to the arbitration provision of the partnership agreement and to enjoin him from prosecuting the Mexican proceeding. Curtis alleged irreparable harm if the Mexican proceeding were not enjoined, namely, the expense of defending in a foreign jurisdiction and the possibility of disparate results in the two forums.

In opposition, Garza-Morales argued that he was not bound by the arbitration clause because his relationship with Curtis was not that of a true partner. He further contended that under Mexican law, workers are not permitted to waive earned compensation or other benefits, and that Mexico had the greater interest in determining this dispute because the firm was actively engaged in business there and it had consented to be governed by Mexican law. Lastly, Garza-Morales argued there was no irreparable harm to Curtis since it had lawyers in Mexico to defend it there.

In its May 7, 2002 order, the IAS court rejected Garza-Morales's claim that he was not bound by the arbitration clause because he was not a true partner, and compelled him to arbitrate. With respect to the injunctive relief, the IAS court relied on this Court's decision in *Matter of Propulsora Ixtapa Sur (Omni Hotels Franchising Corp.)* (211 AD2d 546 [1995], *lv denied* 85 NY2d 805 [1995]), which held that it was error to stay the arbitration of a dispute, also the subject of a previously commenced Mexican lawsuit, where the parties' marketing agreement was to be construed in accordance with New York law and required arbitration of all disputes in New York. Although the IAS court in this case acknowledged that *Matter of Propulsora* did not involve the propriety of enjoining a party from proceeding with foreign litigation,* it nevertheless relied on this Court's statement in that case that comity is not a rule of law, but only of practice, convenience and expediency (*id.* at 548) to support its holding that the rule of comity was no bar to enjoining Garza-Morales's previously commenced Mexican proceeding.

---

* For this reason, *Matter of Propulsora* is inapposite to this case.

The IAS court, in a footnote, distinguished this Court's decision in *Faberge Intl. v Di Pino* (109 AD2d 235 [1985]), which held that it was error to enjoin an Italian-born American citizen, who worked in Italy, from commencing a suit against his employer in an Italian labor court, despite the fact that his employment contract contained a clause providing for arbitration in New York. In distinguishing *Faberge*, the IAS court opined that our decision may have been based on the fact that the employee had been working in Italy for 13 years prior to his termination, while Garza-Morales did not dispute Curtis's contention that his primary office was in New York and that he billed no time in Mexico during the years 2000 and 2001.

On appeal, Garza-Morales argues that the IAS court ignored the proper standard enunciated by the Court of Appeals for determining whether a New York court may enjoin a litigant from prosecuting claims in a foreign tribunal. Under that correct standard, he contends, the rule of comity requires that Curtis's motion for injunctive relief prohibiting him from prosecuting the Mexican proceeding be denied.

In *Arpels v Arpels* (8 NY2d 339, 341 [1960]), the Court of Appeals stated: "The use of the injunctive power to prohibit a person from resorting to a foreign court is a power rarely and sparingly employed, for its exercise represents a challenge, albeit an indirect one, to the dignity and authority of that tribunal." Thus, "an injunction will be granted only if there is danger of fraud or gross wrong being perpetrated on the foreign court" (*id.*).

In *Faberge*, this Court applied the *Arpels* standard in a context similar to that in the present case. In *Faberge*, an Italian-born American citizen was terminated by his employer, for whom he worked as an international sales executive in Italy. A written employment agreement provided that it would be governed by New York law and that all controversies relating to the agreement would be arbitrated in New York City. After the employee announced his intention to institute an action before the Italian Labor Court, the employer commenced an action in New York seeking, inter alia, to enjoin the employee from commencing suit in any forum other than New York. The motion court granted the employer's motion to enjoin any action in the Italian forum and compelled arbitration. On appeal, this Court upheld the direction to arbitrate in New York but reversed that portion of the order "restraining [the employee] from pursuing his Italian statutory rights in an Italian forum." (*Id.* at 238.)

In addition to quoting the *Arpels* standard requiring a fraud or gross wrong, in *Faberge* we found it significant that the record was devoid of proof "that the arbitration clause was intended to encompass defendant's Italian statutory rights" so as to infer a waiver of those rights (*id.* at 240). In addition, we explained that even if such a waiver could be inferred from the arbitration clause, the court "acting pursuant to the principles of comity, should have then weighed the Italian public policy objectives of the affected statutes against New York's policy in favor of arbitration to determine whether any waiver should be enforced" (*id.*). Since we found nothing in the record "to indicate that the [employee's] Italian statutory claims arose out of the agreement or were subsumed or precluded by the agreement" (*id.* at 241), we concluded that these claims had a validity independent of the agreement and vacated the injunction.

Curtis has failed to meet its burden, as movant, of demonstrating that Garza-Morales should be enjoined from pursuing his claims in the Mexican proceeding. Before the IAS court, Curtis did not even attempt to show that "there is danger of fraud or gross wrong being perpetrated on the foreign court" (*Arpels* at 341), and its attempt to do so on appeal is hardly persuasive. Curtis argues that certain "flagrant misstatements of fact" by Garza-Morales suggest a substantial danger of fraud being perpetrated upon the Mexican labor tribunal. Curtis's characterization is exaggerated. For instance, although Curtis contends that Garza-Morales's assertions that he maintains a residence in Monterrey, that he was employed in Mexico while at the firm, and that he divided his time between Mexico and New York are outright false, in fact, Garza-Morales offers evidence supporting each of these assertions.

The *Faberge* decision also requires us to look at whether the arbitration clause in issue here was intended to encompass the Mexican statutory and constitutional employment rights asserted by Garza-Morales in the Mexican proceeding. On this point, Curtis argues that *Faberge* is distinguishable, since in that case it was uncontested that the Italian employee had certain statutory claims under Italian law and no proof existed that the arbitration clause encompassed such claims. Here, in contrast, Curtis argues that as a nonequity partner of a New York law firm, who resided in New York and rarely performed work in Mexico, Garza-Morales "obviously could have no legitimate claim to any Mexican statutory benefits afforded to employees in Mexico." Thus, Curtis essentially argues that Garza-

Morales has no viable claims under Mexican law because he is not an "employee" working in Mexico, and therefore his claims for compensation and reinstatement must be encompassed within the broad arbitration agreement.

The problem with Curtis's position is that it is based on factual and legal assertions that are hotly contested by Garza-Morales. For instance, while Curtis asserts that the Mexican labor laws cited by Garza-Morales apply only to laborers in Mexico, not law firm partners based in New York City, Garza-Morales disputes this and says that the Mexican labor tribunal has exclusive jurisdiction over his claims. This conflict cannot be resolved in favor of either party on the present record.

A similar factual conflict undermines the IAS court's attempt to distinguish *Faberge* from this case. The IAS court relied on the fact that the Italian employee in *Faberge* had apparently lived and worked in Italy for 13 years in order to find that his Italian statutory rights existed independently of the arbitration agreement. In this case, however, the court summarily concluded that Garza-Morales lacked a sufficient nexus to Mexico to benefit from its labor laws, despite substantial evidence to the contrary. Indeed, the record shows that Garza-Morales was a founding partner of Curtis S.C.; correspondence, including some from Curtis, shows that he spent substantial time working in Mexico; and Curtis's argument that he did not bill for any time in Mexico during the years 2000-2001 certainly raises a strong inference that he did so for the years 1991-1999. Indeed, given Garza-Morales's role in establishing Curtis S.C. and Curtis's holding him out as a "Mexican partner," it is incongruous for Curtis to argue that his ties to Mexico are weak.

In my view, Curtis has failed to establish that Garza-Morales's claims under Mexican law are not viable and, more significantly, that they were intended to be encompassed by the parties' arbitration clause. Additionally, even if Garza-Morales's Mexican claims were encompassed within the agreement, in order to enforce a waiver of foreign rights, the court must, under the rule of comity, determine whether the public policy objectives of the foreign jurisdiction's laws are outweighed by New York's strong policy in favor of arbitration (*Faberge* at 240). That was not done in this case.

The majority mischaracterizes Garza-Morales's position and the precedent upon which he relies. Garza-Morales has not argued that the doctrine of comity will invariably override a valid agreement to arbitrate in New York. Nor has the major-

ity provided any support for the premise underlying its holding—that Garza-Morales is attempting to avoid arbitration by resorting to pretextual litigation in a foreign forum.

Garza-Morales has simply asked this Court to require Curtis, as the movant seeking the extraordinary relief of enjoining litigation commenced in a foreign country, to satisfy the substantial requirements for such injunctive relief as enunciated by the Court of Appeals and this Court. Specifically, it must show a "danger of fraud or gross wrong being perpetrated on the foreign court," that the arbitration provision at issue could be read to encompass Garza-Morales's statutory rights under Mexico's labor laws so as to infer a waiver of those rights, and that New York's policy in favor of arbitration outweighs the public policy objectives of Mexico's labor laws (*Arpels*, 8 NY2d at 341; *Faberge*, 109 AD2d at 240-241).

The majority's attempt to limit *Arpels* to nonarbitration cases is unavailing. Nowhere in the broad language used in the *Arpels* decision did the Court of Appeals suggest that the caution which must be exercised in enjoining foreign litigation is necessary only in cases that do not involve an arbitration agreement. Indeed, the majority's contention that *Arpels* does not apply in an arbitration context is belied by this Court's reliance on *Arpels* in the *Faberge* decision, a holding with which the majority apparently disagrees.

The majority's attempt to distinguish *Faberge* is not convincing. The *Faberge* Court's determination to deny injunctive relief, insofar as the decision itself states, was not based on where the employment relationship was centered or exactly how many days the employee worked in Italy. Rather, the injunction was found improper because Faberge failed to show a danger of fraud being perpetrated on the foreign court, that the arbitration provision could be read to encompass the employee's Italian statutory rights so as to infer a waiver of those rights, and lastly, that New York's policy in favor of arbitration outweighed the public policy objectives of the Italian labor laws (*Faberge*, 109 AD2d at 240-241; *Arpels*, 8 NY2d at 341). Moreover, although the majority argues that the broad arbitration clause in this case cannot be plausibly read to exclude Mexican statutory claims, the clause in *Faberge*, no broader in scope in my view than the instant one, was held to exclude similar statutory claims.

Although the majority believes that complying with *Faberge*'s requirement of weighing the competing public policy objectives "raises more questions than [it] answers," I respectfully

disagree. I view this requirement as a valuable means of determining whether the extraordinary relief of enjoining litigation in a foreign jurisdiction, and its concomitant challenge to the authority of that tribunal, is appropriate in these circumstances. While the majority posits that Garza-Morales has not explained how the courts should weigh the competing public policy objectives, courts routinely engage in similar balancing in deciding questions of jurisdiction and choice of law. I also disagree with the majority's contention that Garza-Morales, the nonmovant, should bear the burden of demonstrating that an injunction against foreign litigation is inappropriate. The movant seeking such extraordinary relief should bear the burden of demonstrating that injunctive relief is appropriate (*see Smoothline Ltd. v North Am. Foreign Trading Corp.*, 2002 WL 273301, 2002 US Dist LEXIS 3123 [SD NY, Feb. 27, 2002]).

Finally, the majority's argument that the dissent has failed to explain how "Mexico's policy precluding full enforcement of the parties' arbitration agreement outweighs New York's policy favoring full enforcement of that agreement" misses the point. The dissent's position, as should be clear from the above discussion, is not that the public policy objectives of Mexico's labor laws necessarily outweigh New York's policy favoring arbitration. Rather, it is that the IAS court failed to weigh these policies at all, as required by *Faberge,* and in doing so, failed to hold Curtis to its high burden of proof in obtaining the requested injunctive relief. I would reverse and vacate the injunction.

BUCKLEY, P.J., and SULLIVAN, J., concur with FRIEDMAN, J.; GONZALEZ, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered May 7, 2002, and order, same court, entered June 25, 2002, affirmed, without costs.